ALDEN A. BARDEN V. STATE OF NEBRASKA.

FILED APRIL 3, 1915. No. 18751.

1. **Judges: ACTING JUDGE: FAILURE TO GIVE BOND: PLEA IN ABATEMENT.** When a county judge is disqualified to act in a case pending before him, and county commissioners appoint a person to act as judge in such case, and by virtue of such appointment he holds a preliminary examination of a person accused of crime, objection to his qualification to so act on the ground that he failed to give the bond required by statute, made for the first time by plea in abatement in the district court, is properly overruled. As against such objection, such acting county judge must be regarded as an officer *de facto*.

2. **Highways: ESTABLISHMENT: OBSTRUCTION: PROOF.** A public highway may be established by dedication and use, or by adverse user for ten years. But when a defendant is prosecuted for obstruction of a highway by encroaching upon the alleged limits of the right of way, but not upon the line of travel, it must be proved

with some degree of certainty that the encroachment complained of is within the limits of the land dedicated, or adversely used.

3. ———: OBSTRUCTION: PROSECUTION. If the county commissioners by regular proceedings establish a public highway with definite location and boundaries, one who wilfully obstructs such road may be prosecuted under the statute for nuisance in obstructing a public highway.

4. ———: LOCATION: CRIMINAL PROCEEDINGS. It is not the policy of our law to determine the locality of public roads, when indefinitely located, by criminal proceedings.

5. ———: OBSTRUCTION: PROSECUTION: LOCATION: PROOF. In a prosecution for obstructing a highway by the adjoining landowner by placing a fence along the side of his land, but which it is alleged is so placed as to encroach upon the highway, the location and boundaries of the highway as extending to and including the locality of such fence must be proved beyond a reasonable doubt.

6. ———: ———: ———: ———: SUFFICIENCY OF EVIDENCE. In such case, if the evidence of the locality and boundaries of the highway is so indefinite and uncertain that it cannot be determined beyond a reasonable doubt that such fence is within the limits of such highway, a conviction cannot be sustained.

7. ———: ———: SUFFICIENCY OF EVIDENCE. The judgment in this case is clearly wrong because the evidence fails to establish the locality and limits of the alleged highway with any certainty, and does not prove that the fence complained of is within the limits of a pubic highway.

ERROR to the district court for Otoe county: JAMES T. BEGLEY, JUDGE. *Reversed.*

*A. L. Tidd* and *Livingston & Heinke,* for plaintiff in error.

*Grant G. Martin, Attorney General,* and *Frank E. Edgerton, contra.*

SEDGWICK, J.

The defendant, who is plaintiff in error here, was found guilty in the district court for Otoe county on the charge of nuisance by obstructing a public highway, and has brought the case to this court by petition in error.

1. The defendant filed a plea in abatement in which he alleged that he had no preliminary hearing on the com-

plaint filed against him in the county court, for the reason
that the appointment of W. W. Wilson as special acting
county judge of Otoe county, Nebraska, "is void, for the rea-
son that no bond was required of him as required by law,
and that he did not qualify as required by law by giving a
bond." It is not stated in the brief, and we have not ob-
served, that the record shows that any objection was made
to the qualification of this special county judge at the
preliminary or until this plea in abatement was filed in the
district court. The statute requires such specially ap-
pointed officers to give bond, but it is not necessary in this
case to determine whether the failure to give such bond
would disqualify him to act if timely objection had been
made. It seems clear under the authorities that, unless
such objection is made before the conclusion of the hear-
ing, the judge so appointed must be regarded as an offi-
cer *de facto*. Constantineau, Public Officers and the De-
Facto Doctrine, sec. 137; *In re Hewes*, 62 Kan. 288; *Tower
v. Whip*, 53 W. Va. 158.

2. There are several assignments of error in the brief,
but we find it necessary only to consider one of them. The
record shows that in 1871 a petition was filed with the
county board of Otoe county asking for the opening of a
road on the section line east of the land now owned by the
defendant. The county board appointed a commissioner
to locate the road. The commissioner reported to the
county board that he had surveyed the location of the
road, and the field notes of his survey are included in his
report. These field notes show a bend in the road sur-
veyed encroaching upon the lands in question then owned
by the defendant's grantor. There was no hearing before
the county board, no order made opening the road and
defining its limits, and, of course, no damages paid the
owner of this land. The evidence also shows that the road
was thereafter used by the traveling public and has contin-
ued to be a much traveled road until the present time.
About a year before this prosecution was begun, the de-
fendant built the fence along the east side of his land, and
it is charged in the information that this fence infringed

Barden v. State.

upon the public highway. A bend of a creek extended across the section line, and the commissioner had made the survey around this bend along the plaintiff's land. The defendant contended that he had placed this fence well within his own land so as to leave the whole of the public highway unobstructed, and this is the question of fact upon which his guilt or innocence depends.

It would seem that if the field notes of the commissioner are intelligible, as they are alleged by the prosecution to be, there would have been no difficulty in establishing beyond question how far the road, which was surveyed by the commissioner and adopted by the public, extended from the section line into the defendant's land. The distance from the section line of the fence which the defendant erected could also be established by actual measurement. There was no attempt at definite and exact evidence upon these points. The prosecution would ask a witness whether the defendant's fence infringed upon the road, and when the witness answered that he had been along there some years before, but paid no attention to the matter and could not state how far, he was asked and allowed to give his best judgment. Under such circumstances we have all manner of estimates in regard to the distance.

Mr. Fritz Hillman was a witness for the prosecution. His evidence is perhaps as definite and reliable as any. He had been acquainted with the road for 40 years, and had traveled over it "thousands of times." He testified: "When I first knew it, I didn't know exactly where it was. Afterwards it was farther west, probably six or eight or ten rods, something in that neighborhood, from one back to another. That was prairie at that time, as near as I can recollect. Then the man that owned it broke up that bottom, and he naturally crowded the road back to the creek. Whether he did that or the neighbors, I don't know. Whoever traveled it there at that time crowded the road back to the creek where this little bend comes now. As long as I can recollect, there has been trouble right there. At that time it was sloping down towards the creek. Whoever did it, I don't know; somebody worked it and leveled that off

Barden v. State.

so that it went slanting pretty close to the edge of the creek. When first I knew it, it was kind of slanting. We always had to watch out or our wagons would slide down into the creek. Q. Now, how has it been as to slant since the road has been worked? A. It is pretty much level. Q. Now, state where the road was from the time you knew it up to the present time with reference to the section line at this bend. A. The section line that runs straight through—why, the edge of the bank, the west edge from the creek bank, was probably eight or ten feet farther west, about two rods that would be in the road, about two rods that left belonging to the road; it was probably eight or ten feet, in my judgment, from the edge of the bank up farther west. * * * Q. State the condition of the road about 30 years ago, and what it was three or four years ago with reference to this bend. A. It was just the same, only it was worked a little—made it a little smoother and leveler. Three or four years ago it was just the same as it was 30 years ago, only in a little better condition. Q. State as to the locations 20 years ago and three or four years ago. A. I said it was about the same. I didn't see any difference; if there was any difference it was very little. I didn't notice it. Q. Now, state if there is any difference in the west bank of this bend; state if there is any difference in the west bank of this bend now and 30 years ago. A. Yes; it had been worked down. Q. Tell the jury the difference in the location. A. There is no difference in the location, only that the bank is worked down, that I know of. Q. State whether or not the edge of the bank along this bend is where it was 30 years ago, or whether it is farther east than it was 30 years ago. A. I think it's practically the same, only it's been worked down now; that's all the difference I could see." On cross-examination he testified: "Q. The road now is on the section line, is it not? A. Well, somebody worked it. The last couple of years they drove through the ditch; they have filled that up now, and it's on the section line now. Q. How long have they been working on it, you say a couple of years on the section line? A. No; I didn't

say that. Q. Well, about how long? A. A week or two ago. Q. They drove through on the section line a couple of years ago? A. Yes, sir. (The remainder of the answer to this question was stricken out.) Q. When was the first time you traveled over this road? A. In the fall of 1873. Q. Was the road on the section line then? A. No, sir; there was no bend there, it was on both ends where the two banks, these two creeks were. Q. But not at the bank? A. Not where that bend was in the road, no. Q. When did that bend get back to the bank? A. Several years afterwards. At that time it was farther west. Q. Farther west than the bank? A. Six or seven rods, something like that. Q. There was no fence there to shut off driving across the prairie? A. Yes, sir. Q. When was it that you drove over and noticed it was slanting the first time? A. I don't recollect just when. Q. How long was it after you were over it the first time, about? A. I drove over that road probably two or three times a week. I don't know just when that was. Q. How much farther west was it at that time than when you first knew the road? A. I don't recollect that exactly. I think from six to eight rods, maybe ten. Q. There is a bridge farther north, is there not, on the section line? A. No. Q. It's east of the section line? A. Yes; I believe it's east. Q. And has been for some time? A. Yes, sir. Q. It's a little hard to locate the section line there exactly? A. No; I don't think so. Q. You don't think so? A. No, sir. Q. Isn't it hard to locate the section line there where the road runs eight or ten rods west of the curve? A. I don't know whether it is or not. Q. As a matter of fact, you don't know of your own knowledge that any part of this road is on the section line? A. No, sir; I never measured it out. Q. So far as it being a section line or not a section line is simply a guess of yours? A. Yes, sir. Q. Now, at the point of this curve, didn't the water, the flood water, wash the dirt away? A. I don't think so, not to amount to anything. Q. Wasn't it that that caused the slant in the road? A. No; the slant in the road was where it was crowded pretty well toward the creek bank, that gradually

pushed the dirt in. Q. When was it first leveled off to your knowledge? A. That I don't know." On redirect examination he testified: "Q. In answer to Mr. Livingston's question, you said that about a year or more than a year ago they drove through this ditch? A. Yes, sir. Q. Explain to the jury why it was necessary to drive through this ditch. A. Well, somebody worked that bank of the curve there in the road—worked it and left it in such poor condition that hardly anybody could drive along there. They took the fence down, I did myself, and drove right straight through." He was asked as to the condition of the road along the section line across the creek, and answered: "I went through them holes there myself. It was a break-neck job. Q. Those that went through had to go through this ditch because of the fence that was there at that time? A. Yes, sir. Q. Now, state whether or not people went through there after this fence was removed, through this ditch? A. They did. I say the bank on the west side was worked, but left in such poor condition that people drove through below. Q. Was that before a year ago? A. Well, before a year ago, I guess."

From this and other similar evidence the jury were asked to find the location of the public highway and determine whether the defendant's fence obstructed the same.

There is also evidence that the creek at this point has continually washed away its banks in the defendant's lands during the 40 or more years since the county board procured their commissioner's field notes as to the location of the road. If this is true, and the place of travel was moved from time to time, still, if the washing was irregular so that the line of travel remained permanently in any one locality for the space of ten years, the public, if their use of the line of travel excluded the defendant's use of the land, might acquire a right of way by prescription. Even under such circumstances a serious question might arise as to how far beyond the line of travel the public right extended. Under the evidence in this case it is impossible to find with any degree of certainty how far this erosion of the banks of the creek extended, or even whether

it extended so far into the defendant's land as to be worthy of consideration in this case. Many witnesses were questioned upon this point, but, generally speaking, they all showed that they had no definite knowledge upon the point, and no measurements were taken. It would be difficult to say whether there is a preponderance of evidence as to any particular locality of the highway, but it is certain that this evidence does not establish beyond a reasonable doubt that the public highway extended beyond, so as to include the line upon which defendant's fence was constructed. The location of this highway is, of course, the basis upon which defendant's guilt is predicated, and he cannot be convicted of crime unless this location of the highway can be proved beyond a reasonable doubt.

Formerly criminal law was used as a method of determining the locality of roads under doubtful circumstances, But that is not the policy of our law. It appears to be conceded that the road extends farther into defendant's land than it did as it was formerly traveled by the public. As to how much farther it extends into defendant's land is, so far as this evidence goes, entirely indefinite. It is manifest from this evidence that the defendant and county authorities disagree in good faith as to where this road actually is. Under such circumstances, if the county authorities had proceeded to establish the road and have its boundaries definitely determined and located and made a matter of public record, and the defendant had thereafter wilfully obstructed the road so established, he might, under our statute, have been prosecuted for nuisance in obstructing a public highway; but there is no evidence in this record from which it might be found, beyond a reasonable doubt, or even with any plausibility, where the limits of this road really are. Under such circumstances, it cannot be said that the defendant has been shown to be guilty of crime beyond a reasonable doubt.

The judgment of the district court is therefore

REVERSED.

MORRISSEY, C. J.,not sitting.

Barden v. State.

HAMER, J., concurring.

I am obliged to vote for the majority opinion, although I regret to do so. The trouble is that it is a criminal case, and, of course, the rule is that the defendant may not be found guilty unless the evidence shows his guilt beyond a reasonable doubt. I do not think any one ought to be allowed to exercise his guess as to where the road is and then be permitted to fence it up. If there is a road there which people travel, then that fact alone ought to be enough to establish the "road" and require its maintenance. It should then be the business of the landowner and everybody else to keep out of the road with any sort of obstruction until there is an adjudication in a civil case to the effect that it is *not the road*. It is a technical rule that permits the defendant to get in and occupy the road and crowd the public out of it and make it dangerous to travel, and yet not be punished for it. I am in favor of the adoption of a rule that, no difference where the boundaries of the road may be actually shown to be by a survey, it is the duty of everybody to keep off the road with any sort of fence or obstruction. I would have every road a "road" as long as it was traveled and until the court in some sort of civil case got in and said that it *really was not a road*. I would make a road "a sacred institution" and have everybody keep hands off of it. As it is presented, this is a criminal case, and the inexorable rule is that in a criminal case, before the defendant can be found guilty, the evidence must show his guilt beyond a reasonable doubt. I do not like to make a criminal case out of it, but it is a criminal case, and there is no help for it. Every road should be a road to *Rome,* and it should be kept open alike to the citizen and the soldier. I would make it sacred.

ROSE, J., dissenting.

Defendant was accused by the state of unlawfully obstructing a highway by means of a fence. The jury found him guilty beyond a reasonable doubt. The conviction should be affirmed. The existence and continuous use of the highway since 1873 is established beyond reasonable

controversy.   There is convincing proof that defendant
fenced part of the traveled roadway.   A credible witness
testified that he was familiar with the road.   He said that
he had worked on it at the place in controversy 20 years
ago, had since traveled it, had torn down the fence, and
that he thought there was in the meantime little or no
difference in the location.   Another witness said the road
was in the place it occupied in 1879.   There is more testi-
mony of like import.   The conviction rests on facts estab-
lished according to the usual methods of making proof in
similar cases.   In *Daniels v. People,* 21 Ill. *439, there
was a dispute whether a road had been located at the
point of obstruction or on a line lateral to it.   The prosecu-
tion was maintained on evidence tending to prove that
the road at the place of obstruction had been located and
used for the statutory period.   In *State v. Davis,* 27 Mo.
App. 624, the rule is stated as follows: "In an indictment
for unlawfully obstructing a public highway, proof that
the part of the road obstructed by defendant had been in
use for more than ten years preceding the act of interfer-
ence, as a public highway, is sufficient to support the in-
dictment without any record proof of the establishment of
the road by an order of the county court."   There is
abundant authority to the same effect.   It was unneces-
sary to inquire into the original proceedings even in a
criminal prosecution.   *Lydick v. State,* 61 Neb. 309.   In
condemning the case made by the state, the majority, in my
opinion, have departed from recognized rules of law and
evidence.

The doctrine of the majority that it is not the policy of
the law to determine in criminal proceedings the location
of indefinitely located roads is a radical departure from
the statutes and from the former decisions of this court.
When the legislature speaks by means of a valid enact-
ment, it declares the policy of the law, and in that respect
leaves nothing for the determination of the courts.   Ob-
struction of highways is repeatedly denounced by the
Criminal Code as unlawful.   Violators of the statute "shall
be fined in any sum not exceeding five hundred dollars,"

said the lawmakers. Rev. St. 1913, sec. 8845. No distinction or exception is made in regard to "roads when indefinitely located." It is the duty of the courts to enforce the law as written. The state should not be ordered into the civil courts to redress criminal acts, nor should proper rules of evidence be relaxed in criminal prosecutions for obstructing highways.

In my opinion the county attorney, the trial court and the jury performed their duties in this case.

BARNES, J., concurs in this dissent.